NORTHERN PAC. RY. CO. v. ALTIMUS.

(Circuit Court of Appeals, Ninth Circuit. May 16, 1910.)

No. 1,793.

1. MASTER AND SERVANT (§§ 101, 102, 124*)—DUTY OF MASTER—TOOLS AND APPLIANCES—INSPECTION AND TESTS.

The master's duty to the servant requires the exercise of reasonable care and skill, not only in furnishing safe machinery and appliances, but in keeping them in a safe condition, and includes the duty of making inspection and tests at proper intervals.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 135, 171, 180–184, 192, 235-242; Dec. Dig. §§ 101, 102, 124.*]

2. MASTER AND SERVANT (§ 205*)—DEFECTIVE APPLIANCES—ASSUMPTION OF RISK.

The servant has the right to assume that the master has exercised due care and diligence to provide suitable appliances, and does not assume the risk from the master's negligence in performing such duty.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 547–549; Dec. Dig. § 205.*

Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

3. MASTER AND SERVANT (§§ 288, 289*)—MASTER'S LIABILITY FOR INJURY TO SERVANT—ASSUMPTION OF RISK—QUESTIONS FOR JURY.

Plaintiff, who was helper for a boiler maker working for defendant railroad company, was injured by the breaking of a handle of an air motor which they were using on top of a boiler. The handle was not the kind usually used, but was a piece of pipe, which had been substituted, and was weakened by the deep cutting of the threads; but such defect was not observable, unless the handle was removed and inspected. Held, that plaintiff could not be said as matter of law to have assumed the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

risk, or to be chargeable with contributory negligence, and that such questions were properly submitted to the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1068–1132; Dec. Dig. §§ 288, 289.*]

Ross, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the District of Montana. ·

Action by Joseph C. Altimus against the Northern Pacific Railway Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Wm. Wallace, Jr., R. F. Gaines, and John G. Brown, for plaintiff in error.

Miller & O'Connor and Walsh & Nolan, for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge. The defendant in error received personal injuries from an accident while in the service of the plaintiff in error. He was a helper, working with one Andrews, a boiler maker, on the top of a boiler belonging to the plaintiff in error, tapping out stay bolts. He alleged in his complaint that the plaintiff in error furnished him and Andrews with a certain air motor with which to do the work, and that while he was assisting in the operation of the air motor, and doing the work required of him, it became and was necessary for him to hold a certain handle used in connection therewith, and that while he was holding the handle, and while the motor was in operation, the handle broke and was detached from the machine, causing him to fall violently from the top of the engine to the floor; that the air motor and the handle so furnished him to do the work, which work he was obliged to perform as a boiler maker's helper, were in a defective, unsafe, and insecure condition; that, in the preparation of the said handle for placing it in said motor, it was materially weakened by cutting a substantial portion of it, by reason whereof the accident happened, all of which the defendant knew, or should have known by the exercise of reasonable care. The plaintiff in error set up as a defense that the injuries sustained by the defendant in error were caused by his contributing fault and carelessness, and for a second defense that the injury was due to causes and risks which the defendant in error had assumed.

The assignment of error principally relied upon is that the court erred in overruling the motion, made at the close of the evidence, for a directed verdict in favor of the plaintiff in error. It was shown on the trial that the motor so used for tapping holes in the boilers, which are undergoing repairs, is a machine of considerable size, weighing 40 or 50 pounds; that it is supplied with two handles, one on each side, and so fixed to the machine that, while in operation, one of the handles is held by the boiler maker and the other is held by his helper, and pressure is exerted on the one handle to counterbalance the pressure exerted upon the other to hold the machine in position; that the operations are conducted under the control and direction of the boiler maker,

and that the motors, with the handles, are supplied from the factory. It was shown that sometimes, in order to secure greater leverage, the handles thus supplied were unscrewed from the motor, and others and longer ones were substituted therefor; that the tools were kept in a toolroom in charge of the foreman of the shop; that, when tools were required, application was made to him, and he either directed the applicant to the place where the tools could be obtained or he got them for him.

The defendant in error testified that he had assisted in this and similar work before the time of the accident; that on the day of the accident "the handles were not the same"; that the handle which the boiler maker held was a factory-made handle, while the one which he held was a piece of gas pipe; that he had never before seen a piece of pipe like this on one of those motors. He admitted that the machine was supplied with a regular handle for a helper, and that the one which he was using was not a regular handle; that it was lighter than the regular handle, and that he had never known one of the regular handles to break; that he never before had worked with one of these motors with anything else than the regular handle. He admitted that he had read and understood the rule of the company that employés "are required to see for themselves that the machinery or tools which they are expected to use are in proper condition for the service required, and, if not, to put them in proper condition, or to see that this is done before using them," and that he assented to this requirement before entering into the company's employment.

Andrews, the boiler maker, testified from his experience as a boiler maker that the pipe which the defendant in error used that day was not of sufficient strength to encounter the exertion required. "I say that because it broke. The man using the machine could not tell by looking at the pipe. He could only tell after it was broken or taken out. He could tell by taking it out and looking at it, but that was not done when Altimus was hurt. It was not customary to take handles out and look at the threads." Andrews also testified that the foreman sent him to work on this engine, and told him the tools were there on the boiler; that he went there, and found the air motor which was used; and that he never saw a handle like that one in a machine before, but that there was nothing about the handle to indicate that it was dangerous to use it. He testified he did not know who put the iron pipe handle in.

There was testimony that some of the employés of the plaintiff in error would at times substitute a piece of iron pipe for the regular handle in order to obtain greater leverage, and to render easier the task of holding the machine in position. There is no evidence, however, that the defendant in error knew of this practice, and he denied that he had ever seen or used an iron pipe handle prior to the day of the accident. If, as some of this testimony seems to indicate, it was a common practice thus to substitute an iron pipe handle for the regular handle, it behooved the company, in the exercise of its duty of inspection, to know of that practice, and either to prevent it or to warn its employés against the danger thereof. "The master's duty to the servant requires of the former reasonable care and skill in furnishing safe

machinery and appliances, and in keeping such machinery and appliances in a safe condition, including the duty of making inspection and tests at proper intervals." Comben v. Belleville Stone Co., 59 N. J. Law, 226, 36 Atl. 473; Labatt on Master and Servant, 154. Said the court in Brann v. Chicago, R. I. & P. R. Co., 53 Iowa, 595, 6 N. W. 5, 36 Am. Rep. 243:

"It will not do to say that, having furnished suitable and proper machinery and appliances, the corporation can thereafter remain passive. The duty of inspection is affirmative, and must be continuously fulfilled and positively performed."

It is true that the master is not bound to anticipate injury from the use of simple appliances by an experienced workman, and it is held by many courts that the duty of inspection does not extend to the small and simple tools in everyday use, for the reason that the employé is supposed to be a competent judge of their fitness for use. Wachsmith v. Shaw Electric Crane Co., 118 Mich. 275, 76 N. W. 497. But the appliance which was in use by the defendant in error was not a simple or ordinary tool. It was a machine composed of several parts; and its defects, if any there were, were not exposed to view. The defect which caused the accident was not so patent as to be readily observed. It was a concealed defect, a weakness resulting from the fact that the threads in the pipe handle whereby it was screwed into the machine were cut so deep as to leave the handle of insufficient strength to meet the pressure which was exerted upon it. This weakness might perhaps have been discovered by the defendant in error upon unscrewing the handle and inspecting it; but he was not required to do that. It was not his duty to dismember the machine and search for concealed defects. He had the right to assume, unless he knew the contrary, that the iron handle which he found in the machine, which, notwithstanding that it was not a regular handle, was in use, and to all appearance belonged to the machine, was there under the direction of his employer, and that it was adequate for the purpose for which it was in use. The instruction which he received from the foreman was to use the machine which was there. The fact that the handle was different from the regular handle would not necessarily suggest to him that it was unsafe or defective. On the contrary, the natural suggestion might be that the substitution had been made advisedly, and for the reason that it was better adapted to hold the machine in place than was the regular handle.

Much reliance is placed upon the rule of the company requiring employés to see for themselves that the machinery or tools were in proper condition; but that rule added nothing to the duty of the servant. In the absence of such a rule he is still required to make his own inspection of simple and ordinary tools, and the master cannot by such a rule shift to the servant his own responsibility of inspecting machines and complicated implements. When the whole of the evidence is considered, it is clear that it does not show conclusively that the defendant in error knew, or that a person of ordinary prudence in the exercise of reasonable care and diligence in the situation in which he was placed would have known, that the handle was of insufficient strength for the purpose for which it was used. There was no error, therefore,

in refusing to instruct the jury to return a verdict as requested, either on the ground that the defendant in error was guilty of contributory negligence in using the machine as he found it or on the ground that he assumed the risk thereof.

The foregoing considerations answer the contention of the plaintiff in error that the trial court erred in refusing certain requested instructions as to the relative duty of the master and the servant under the circumstances disclosed in the case. The court gave the jury full and proper instructions upon every branch of the law applicable to the issues. We find no merit in the contention that there was error in instructing the jury that the servant does not assume the risk of his master's negligence. What was said by the court upon that subject is amply sustained by the language of the court in Choctaw, Oklahoma & C. R. Co. v. McDade, 191 U. S. 68, 24 Sup. Ct. 25, 48 L. Ed. 96:

"The servant has the right to assume that the master has used due diligence to provide suitable appliances in the operation of his business, and he does not assume the risk of the employer's negligence in performing such duties. The employé is not obliged to pass judgment upon the employer's methods of transacting his business, but may assume that reasonable care will be used in furnishing the appliances necessary for its operation."

The judgment is affirmed.

ROSS, Circuit Judge (dissenting). The action was for damages for personal injuries received by the defendant in error, who was the plaintiff in the court below, while working as a boiler maker's helper in the shops of the railway company at Livingston, Mont. The plaintiff had been so employed for a period of six months immediately preceding his injury; his duties being to work with the boiler maker with air motors, holding bars, hammers, etc., and, generally, in dismantling, repairing, and reassembling locomotive boilers.

The inside of the fire-box portion of the locomotive boiler, having an area of about 8 by 20 feet, is held to the outside portion of the boiler by a great number of stay bolts, screwed in stay-bolt holes. Being screwed into both the outside and inside iron sheets, it becomes necessary to tap out two holes for each stay bolt; the tap being an instrument used to cut the threading in the sides of the holes, and being turned by an air motor. The motors are made of iron and weigh between 40 and 50 pounds. The weight forces the tap downward, and the motor turns the tap in the hole, so that the work of the boiler maker and his helper is largely to steady the machine, so that the tap will cut straight. That they may do this the motors are fitted with two handles, one called the boiler maker's handle, and the other the helper's handle. The pressure exerted by the two men on their respective handles is in opposite directions, so that, when the tap strains or turns harder, it is not an easy matter to continue to hold it upright and steady. The handles are specially built for strength and steadiness, and come with the motor from the factories. They are of good steel and comparatively short, the helper's handle being about eight inches long, and having a bearing on the end that screws into the machine, which fits flush with the squared surface of a projection on the machine, thus preventing any play or movement of the handle alone.

The evidence is without substantial conflict.   At the time of the plaintiff's injury he was helping a boiler maker, named Andrews, operate one of the motors.   He had previously aided other boiler makers in the same shop in doing similar work, one time helping one named Moore for a period of eight days.   At the time of his injury he had been working with Andrews about two days.   The evidence shows without conflict that the shops were sufficiently equipped with the air motors and their regular handles, and that the men called upon to operate the motors were at liberty to go to the shops and get such handles and other tools as were needed for the work in hand.   The plaintiff testified, among other things, as follows:

"There was quite a good deal of work in the shop then.  It was pretty well crowded.  I don't know how many men were employed there.  I could not say. Yes; there was as many as 50.  Our tools we got out of the tool room.  Yes, sir; there is a foreman in charge of the shop.  He tells you to get on the job, and you go to him for tools, and he tells you where to get the tools.  If you don't get them, he gets them for you.  *  *  *  The handle that I had was a gas pipe with a cap on the end.  The machine carries with it a regular handle for the helper.  The one I was using was not the regular handle.  The regular handle has a bearing at the base of the screw portion, while the gas pipe does not.  You can't see the screw portion of the pipe.  It was in the motor.  There was a bend in that pipe.  I can't just recall where, but there was a bend in it—a dent.  This handle I used was just a piece of pipe with screws on both ends, one end being screwed into the motor, and the other had a cap on it to protect the hand.  This handle that I used was different from the regular handle that goes with the machine.  It is lighter than the regular handle; that is, it has less strength.  This Defendant's Exhibit No. 2 that you hand me is a helper's handle.  I never had one of those handles such as Exhibit No. 2 to break with me.  I don't know whether the helper's handle is longer than the boiler maker's handle or not.  I don't know whether the piece of pipe I had that day was longer or shorter than the regular handle.  Did not take any particular notice; could not say.  I don't know.  I never worked with one of those motors with anything else than a common handle; but on the day I was hurt there was something else than a common handle on it. Yes, sir; Defendant's Exhibit No. 3 is a boiler maker's handle.  Seeing the two together, I will say that it is longer than the helper's handle.  The boiler-maker also assists in holding the machine steady.  Defendant's Exhibit No. 4 is about the same sort of piece of pipe as I had, except the one that I had was lighter and had a tap on one end of it.  It screwed into the helper's side of the machine.  I don't just remember the length of the one that I used."

Andrews testified, among other things, as follows:

"Altimus was working with me as helper on the day that he was hurt.  We were sent on the job by the foreman.  Q. Did he tell you anything about getting tools and where you would get them?  A. No, sir; he just told me to go over and get to work on the job, and what to do.  It was customary to have a motor on that kind of a job, and there was one there on the boiler that we went to work on.  We were working on the fire-box portion of the boiler.  It was turned up on the side and we were on the top side tapping out those holes to put in the stay bolts, putting in the threads to run the bolts through"—

when Altimus' handle broke, causing him to fall and sustain the injury for which he sued.

Testimony of the witnesses Moore and Wallace, who were also boiler makers employed in the company's shops at Livingston, is to the effect that, notwithstanding the regular handles sent from the factory with the air motors to be used in their operation were stronger

and better, yet the helpers would at times use in lieu of them pieces of gas pipe which were longer and afforded more leverage, thereby making the work easier. I extract from the testimony of the witness Wallace as follows:

"I am a boiler maker of 29 years' experience. Been in the Livingston shops 2½ years. Was employé there during the interval between January 22 and July 23, 1908. Mr. Altimus was also employed there as a helper. He acted as helper for me. He has assisted me with the use of an air motor as a helper. There was a toolroom in the Livingston shops at that time. It is a place to keep tools, keep them in repair. Every man can go in and ask for what he wants, and in a great many instances he can go in and select what he wants. These air motors are furnished with regular handles. There is considerable difference between a gas-pipe handle and a regular handle. The handle made for the motor has a shoulder, or bearing, to fit up against the motor, while the gas pipe has not. Then the regular handle is a heavier piece of metal; that is, heavier than the gas pipe. It is also shorter than the gas pipe. A longer handle gives you more leverage. All of these differences are easily discernible to an ordinary employé. As to the probability of their breaking, well, there would be danger of a pipe breaking before a regular handle would. You could get more leverage if you wanted it on the regular handle of the motor without removing it—two or three different ways of doing it. You could put a piece of pipe over the handle, or in the handle, or put a piece of wood in. A workman in the Livingston shops who finds a handle on a motor defective has the means at his own disposal of getting a regular handle by going to the toolroom. Helpers sometimes use pipe handles inside of the regular handle. The regular handle, though, is easily distinguishable from a pipe handle. We have no other use in the shops for these regular motor handles, other than in the motors. These motors, when they are first brought out, have the regular handles in them, and the changes from a regular handle to a pipe handle are made by the man using the motor."

On cross-examination this witness further testified, among other things, as follows:

"These machines and things are in the toolroom, with a man in charge. He sees that the tools are in repair and ready to be handed out. Yes, sir; it has been the practice in the Livingston toolroom for the men to go right in anywhere and pick up the tools or throw them down. A man could go in most of the time and select his own tools. Yes, sir; a number of tools are assigned to a particular place. No, sir; it is not a grab-bag proposition to pick up a tool. There are racks and receptacles made for certain tools. It is the duty of the toolroom man to keep things in order. Yes, sir; I think there were gas-pipe handles used before July, 1908. To get more pressure you would use a gas pipe or a stick. That would be one of the three ways that I know of of getting more leverage. No, sir; there is not always a demand for all of the leverage possible. There is some work that requires less power than other. Well, I could not say it is necessary to have greater power at all times or at any time. No; I didn't say that they all used these gas-pipe handles. No, sir; they don't do it for fun. It is to make it easier for themselves. If you get more leverage, you can hold the machine much easier. No, sir; I don't mean that the ease is because the regular handle is smooth and the gas pipe is rough. That does not make any difference. It would be less power that you would have to exert on the longer handle. Yes, sir; I mean that with the same pressure on a longer handle you could get a result with less exertion than with a shorter handle. As to the likelihood of being able to tell when a long handle is going to break, I don't know that a man could tell when anything is going to break. The same is true as to a shorter handle. The likelihood would be in favor of the longer handle breaking."

The testimony of the witness Moore, also a boiler maker, was to the same general effect, and, as has been before said, there was really no substantial conflict in the evidence.

It is thus seen that, although the company's shops were equipped with the regular and proper helpers' handles, longer pieces of gas pipe, but of less strength, were not infrequently used by the helpers because of the greater leverage and consequently less work. Who put the particular piece of gas pipe in the motor in question which proved of insufficient strength to do the required work does not appear; but it is clear, I think, that the law did not require the company to see that its employés did not use an improper handle, when it had performed its duty by furnishing suitable handles easily accessible to the employés. According to the plaintiff's own testimony, he was familiar with the motors and with the regular handles made for and supplied with them, yet he knowingly used instead thereof a piece of gas pipe, lighter and of less strength than the proper handle, although affording him greater leverage and consequently easier work.

I think the court below should have granted the defendant's motion to instruct the jury to render a verdict in its favor.