FOSTER v. BUCKNALL S. S. LINES, Limited.

(Circuit Court of Appeals, Second Circuit. June 12, 1913.)

No. 208.

1. MASTER AND SERVANT (§ 124*)—INJURIES TO SERVANT—DEFECTIVE APPLIANCES—DUTY OF MASTER.

A master is not only under obligation to exercise care and caution to provide safe, suitable, and sufficient machinery, means, and appliances for use of his servants, but is also bound to exercise reasonable care to inspect the appliances so furnished, discover defects, and remedy them.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 235–242; Dec. Dig. § 124.*]

2. SHIPPING (§ 84*)—SERVANT OF STEVEDORE—DEATH—SHIPPING TACKLE—LIABILITY OF VESSEL.

Where a stevedore's contract for loading a vessel provided that it should have the use of the cargo appliances on board, "including rope and steam, as customary," and a servant of the stevedore was killed by reason of defective rope furnished by the vessel, the owners of the vessel were liable, on proof of negligence of the master in furnishing the rope, or in failing to use reasonable care by inspection to ascertain whether it was defective.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 342, 349, 351; Dec. Dig. § 84.*]

3. SHIPPING (§ 84*)—STEVEDORES—DEATH OF SERVANT—DEFECTIVE APPLIANCES.

Where a stevedore's servant was killed by the breaking of a rope furnished by the vessel under the stevedore's contract entitling him to use of the vessel's cargo appliances, "including rope and steam," a conclusion of law by the court, trying the case without a jury, that the owners of the vessel could only be liable on proof of actual notice of a latent defect in the rope, rendering its further use after notice dangerous, was erroneous.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 342, 349-351; Dec. Dig. § 84.*]

Lacombe, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Eastern District of New York.

Action by Isabella Foster, as administratrix of the goods, chattels, and credits of Albert J. Foster, deceased, against the Bucknall Steamship Lines, Limited, to recover damages for the death of plaintiff's intestate, who was killed while at work on defendant's steamship, the Amatonga. On writ of error to the District Court for the Eastern District of New York to review a judgment entered upon a decision of the court dismissing the complaint, the parties having stipulated to try the cause before the court without a jury. The action was brought by the plaintiff, as administratrix, to recover damages for the death of her husband, who was killed while at work on the defendant's steamship Amatonga. A prior suit upon the same cause of action was tried and a verdict of $8,500 was rendered for the plaintiff. For reasons, which it is not necessary now to consider, this verdict was set aside and the prior suit was dismissed. Reversed.

Alfred C. Cowan, of Brooklyn, and William C. Beecher and Avery F. Cushman, both of New York City, for plaintiff in error.

Convers & Kirlin, of New York City, and Charles T. Cowenhoven, Jr., of New Brunswick, N. J., for defendant in error.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

COXE, Circuit Judge. At the time of the accident which resulted in the death of the plaintiff's intestate the defendant's steamship Amatonga was lying at Pier 6, Jersey City, taking a cargo consisting, in part, of iron pipe. The work of loading was in the hands of M. P. Smith & Sons Company pursuant to a contract with the ship's owners, by which it was agreed that the stevedores should supply all necessary tackle and appliances, but should have the use of the cargo appliances on board "including rope and steam as customary." On the morning of September 29, 1909, the work of loading at hatch No. 1 commenced. The boom at this hatch had previously been set up by the ship's crew, but the tackle had not been adjusted. Between 2 and 3 o'clock in the afternoon, while a sling of iron pipe was being swung in, the hauling part of the after port guy rope broke and the load swung over and crushed the plaintiff's intestate against a ladder, causing his death. This rope had been purchased in London in May, 1909, and had been in actual use for 28 days. It had been in use on the day of the accident from the time the boom was put into action until it broke. The rope belonged to the ship and was furnished by the ship for use on the forward hatch. It broke while being subjected to the weight of an ordinary sling load of pipe. The trial judge found, inter alia, the following facts:

"Tenth. Before beginning work on the morning of the accident, the rope which broke had been inspected by Superintendent Foster in behalf of M. P. Smith & Sons Company, and by Chief Officer Jay, of the Amatonga. The rope was in apparent sound condition and reasonably fit for the service to which it was put.

"Eleventh. If there was any defect in the rope, it was a latent defect, of which the defendant did not have, and is not chargeable with, notice.

"Twelfth. The plaintiff offered testimony to prove, but failed to prove actual notice to the defendant of an alleged defect in the guy rope that broke.

"Thirteenth. The servants of the M. P. Smith & Sons Company who were using the ropes and guys in connection with the work of the loading of the ship, did not, at any time prior to the accident, report any defect or insufficiency in any of the ropes or guys that were in use, to their employer, nor did they make any request of their employer that other or different ropes be provided.

"Fourteenth. Neither the M. P. Smith & Sons Company nor any of its servants made any request of the defendant, its agents or representatives for other or different ropes for use in loading the vessel prior to the accident. The defendant had a sufficient supply of other ropes readily available on board the ship which would have been furnished by the ship's officers to the M. P. Smith & Sons Company on their request."

He also found the following conclusions of law:

"First. The plaintiff can recover in this action, if at all, only upon proof of actual notice to the defendant of a latent defect in the rope that broke, rendering its further use after such notice, dangerous.

"Second. The defendant did not have or receive, prior to the accident, notice of any latent defect in the rope which rendered its further use dangerous.

"Third. The accident which resulted in the death of the plaintiff's intestate was not due to the breach of any duty owed by the defendant to the plaintiff's intestate.

"Fourth. The defendant is entitled to judgment on the merits with costs."

If the action had been tried with a jury it would, in our opinion, have been the duty of the court to submit the question of the defendant's negligence to the jury. We do not understand that the master's duty to the servant is discharged when he purchases in the open market tackle upon the strength and soundness of which depend the safety of the lives and limbs of his servants and the servants of others rightfully working on the ship. The fact that the judge was the trier of the facts as well as the law presents an unusual and somewhat difficult problem. We think, however, that the proposition, as stated in the first conclusion of law quoted above, viz., that the master is only liable when he receives actual notice of the existence of latent defects in the appliances which he furnishes to his servants is not a complete and accurate statement of the law.

[1] We understand that the master is under obligation to use diligence, care and caution in providing safe, suitable and sufficient machinery, means and appliances for the use of his servants. His duty does not, however, end when this is done, for he is under an equal obligation to see that the appliances are kept in good condition while in actual use. If defects exist in the original construction of a given appliance, it is his duty to discover them or use due care to that end. If defects develop while in the master's use, he must discover them or at least make some effort to do so. The master cannot sit down in his office, fold his hands, close his eyes and ears and avoid responsibility by asserting that he did not know of the defect which resulted in the loss of a human life. It is his duty to know of it, if it can be discovered by the exercise of reasonable care and prudence. These propositions have been so frequently decided that it is not necessary to refer to the decisions in extenso. A few citations will suffice. Lafayette Bridge Co. v. Olsen, 108 Fed. 335, 47 C. C. A. 367, 54 L. R. A. 33; Northern Pacific v. Altimus, 179 Fed. 275, 102 C. C. A. 631; Francis v. Cramp, 200 Fed. 383, 118 C. C. A. 535. See also Lehigh Valley C. Co. v. Shandalla, 205 Fed. 715. decided by this court May 12, 1913.

[2] The rule is well stated in The Phœnix (D. C.) 34 Fed. 760, as follows:

"When a stevedore has full charge of the loading or unloading of a vessel, and one of his gang suffers injury by reason of defective tackle furnished by the vessel, she is responsible if there be absence of due care upon the part of her master in furnishing the tackle, or in maintaining it in a safe condition."

The fact that the plaintiff's intestate was employed by the contracting stevedores and not by the defendant does not alter the latter's obligation to furnish safe and suitable means and appliances. It agreed to furnish rope and did furnish it. In the case of The Rheola (C. C.) 19 Fed. 926, Judge Wallace says:

"The libelant was performing a service in which the shipowners had an interest, and which they contemplated would be performed by the use of appliances which they had agreed to provide. They were under the same obliga-

206 F.—27

tion to him not to expose him to unnecessary danger, that they were under to the master stevedore, his employer. There was no express contract obligation on their part to either to provide safe and suitable appliances, but they were under an implied duty to each; and the measure of the duty towards each was the same. What would be negligence towards one would be towards the other. Coughtry v. Globe Co., 56 N. Y. 124 [15 Am. Rep. 387]; Mulchey v. Methodist Society, 125 Mass. 487."

[3] The defendant having furnished the rope, the stevedores were entirely justified in using it and in assuming that it was a safe rope to use as a guy. There was testimony by those who saw the rope after the accident that it looked dark and frizzly, that it was torn like a sponge and was dusty and frizzled where it broke. One of the witnesses testified that:

"The inside looked kind of damp as if it had been lying in the rain. I smelled it and it smelled kind of sour like. The break was an uneven break."

We think it must be conceded that the rope was entirely insufficient to withstand the strain put upon it. The presumption is strong that this inherent weakness manifesting itself on the outside as testified to by the witnesses, would have been discovered if a proper inspection had been made before putting the rope to work. In other words, that the defendant's agents might have known, if they had taken reasonable care to find out. But this rule was ignored, and the defendant was relieved from liability because the plaintiff did not prove that it had actual notice of the defect although it could have been discovered if a careful inspection had been made. The proposition that such an inspection was made prior to its being put to use by the stevedores cannot be maintained. If an adequate inspection had been made, it is probable that the defect in the rope would have been discovered.

The error we find in the record is not one of fact, but of law. The situation may be illustrated by assuming that the case had been tried with a jury and the court had charged the law as it appears in the first conclusion quoted above. The jury under such a charge would have been compelled to find for the defendant, even though they were convinced that the defect would have been discovered by the exercise of reasonable care and that the defendant was guilty of negligence in not discovering it. If the next trial be without a jury the trial judge may find that, although the defect was to some extent hidden, a careful inspection might have discovered it. But irrespective of the result in this particular case, it is, in our judgment, of vast importance that the rule as stated above should be adhered to. The safety of the lives and limbs of a multitude of workmen depends upon its enforcement and it would be placing a premium upon recklessness to release the master in cases where the defect which causes the injury was not known to him, but could have been discovered had he exercised reasonable care. Human nature is such that in many cases the master will not be overzealous in seeking information when ignorance is an absolute shield. We think that if he could have known of the defect by the exercise of ordinary care and prudence, he should be held to the same responsibility as if he actually did know of it.

The judgment is reversed.

NOYES, Circuit Judge (concurring).  I concur in the opinion of Judge COXE because I think that the conclusion of law stated by the trial judge that the liability of the defendant depended upon actual notice, was erroneous.  I think that it owed a duty to inspect and that the findings are insufficient to show that it performed such duty.  But I do not attempt to determine whether the rope was in fact defective. That, as I understand it, will be determined upon the new trial.

LACOMBE, Circuit Judge (dissenting).  I am unable to concur with my Associates, not by reason of any difference of opinion as to the law, but because it seems to me that they are applying the law to a state of facts not found.  The trial judge did not take the case from the jury and direct a verdict;  in such a situation every proposition of fact about which the testimony is conflicting would be considered as found in favor of the party against whom verdict was directed.   The cause was tried by the court, without a jury, and it is upon the findings of fact only that this court can review his conclusion that plaintiff was not entitled to recover.   Upon the vital question of fact, viz., whether or not when the operation began the rope was defective or unfit to sustain the strain which it might be expected it would be subjected to, there is no finding at all, nor any request to find.   The majority of the court reach the conclusion of fact that it was unfit to meet expected strain because they credit some witnesses and discredit others. But it seems to me that in a case tried as this was, such is not the function of an appellate court.

There was a sharp conflict of testimony as to the breaking of the rope and its condition.   Witnesses for the plaintiff testified that the rope was 1¼-inch (might have been originally 1½-inch, they grow smaller with use);  that it looked dark and had the appearance of having been in use over a year;  that it looked damp, as if it had been lying in the rain;  that, upon opening the strands, it looked dark and smelled sour;  that a new rope will break with a straight cut, while an old one will frazzle out;  that this one broke when exposed to little strain, to the ordinary strain of a guy rope;  that it broke uneven like a torn sponge, all frazzled and dusty like;  that one of these witnesses before the accident reported to the mate of the steamship that the rope was no good, and was told to go on with it and that a preventer rope would be furnished.

On the other hand, witnesses for the ship testified that it was a 2½-inch rope (possibly 2¼ from use);  that it was 3 months old, and had been used only 28 days;  that it was examined before the accident by one of the ship's officers and by the superintendent of the stevedore, and was then in good condition;  that it broke with a sharp, clean break, where it had been nipped by the chain sling;  that those using it had been cautioned several times not to put extra strain on it by heaving in-board before the sling was clear of the truck, but repeatedly disobeyed these instructions;  that when it broke it was jammed between two parts of the chain;  that its condition was good;  that there was new tackle on board ready to be furnished for this guy on request, but that no such request was made to any of the ship's officers, and no

one said to any of them that the rope was not in good condition or unfit for use.

The trial judge discredited the witnesses who testified that they called attention to the defect. These are the same witnesses who testified that the break was frazzled and that no undue strain was applied. He credited the witnesses who testified that no notification of unfit condition was given to the officers. These are the same witnesses who testified that the break was a clean one, where the chain had pinched the rope, and that, through improper handling, it was subjected to strains a guy was not expected to meet. Upon this state of the record, I am not satisfied that there was any *defect* in the rope which rendered it unfit for service as a guy rope.

That being so, I cannot vote to reverse.