George LATUS, Libelant,

v.

UNITED STATES of America,
Respondent,
and
Todd Shipyards Corp., Respondent-
Impleaded.

No. 20181.

United States District Court
E. D. New York.

Feb. 17, 1959.

Charles V. McDonald, Freeport, N. Y., for libelant.

Cornelius W. Wickersham, Jr., U. S. Atty., Brooklyn, N. Y., for respondent, Benjamin H. Berman, William A. Wilson, Attys., Dept. of Justice, New York City, of counsel.

Galli, Terhune, Gibbons & Mulvehill, New York City, for respondent-impleaded, Todd Shipyards Corp., Patrick J. McCann, New York City, of counsel.

ZAVATT, District Judge.

The libelant sustained personal injuries on the evening of November 23, 1951 while aboard the respondent's vessel, the S. S. Robert Fulton, as a painter employed by the respondent-impleaded (hereinafter referred to as Todd). He was a member of Todd's night-shift gang which was painting the vessel. His injuries were sustained when he attempted to walk across the forward No. 1 hatch. For present purposes it may be found, as libelant contends, that the hatch was covered by a tarpaulin under which there was an opening from which one or more hatch boards, each measuring four by six feet, were missing. The libelant stepped on the tarpaulin at such open spot and fell down the hatch. Although the accident occurred at night there was sufficient light at the place of the accident. No lack of illumination contributed thereto. He seeks recovery against the respondent upon the ground that his injuries were sustained as the result of the unseaworthiness of the vessel and the respondent's negligence. The issue of the respondent's liability to the libelant, and the issue of the liability of the respondent-impleaded to respondent were tried to the Court; the question of damages, if any, being deferred to abide the Court's determination of the issues of liability.

On September 5, 1947 the S. S. Robert Fulton, an ocean-going vessel, concluded her last voyage in navigation and was deactivated in accordance with the standard deactivation regulations prescribed by the Maritime Administration. This was accomplished at a Baltimore shipyard, preparatory to the vessel's being laid up in the James River "moth ball" fleet. All deck gear, including heavy lift booms, was dismantled and stowed in various holds; the ventilators in the mast house and those running down to the fire room and the engine room were removed and similarly stowed; the lifeboats were removed from their davits and similarly stowed; the steering gear was dismantled and the rudder put amidships and lashed; all the lines except tow lines were removed and sent ashore; the compass, sextant, and other navigational equipment were boxed and sent to the Maritime Administration; the heads of the main engine and of all the pumps were removed; the engine room boilers were drained; all the piping was drained and the pipes were disconnected. All of the deactivation work necessarily ren-

dered the vessel unsafe and unseaworthy for navigation. The vessel was then towed to Norfolk, Virginia, and laid up in the James River "moth ball" fleet. Her Certificate of Safety and Certificate of Seaworthiness were surrendered to the Coast Guard and Maritime Administration respectively.

She remained in the "moth ball" fleet until October, 1951 when the respondent decided to reactivate the vessel. She was towed to Todd's yard, leaving the James River on October 19, 1951, and arriving at Todd on October 23, 1951. When the vessel arrived at Todd all of her hatches were closed and covered with tarpaulins and an outer covering of tar paper. There the vessel was placed in dry dock and surveyed. Todd proceeded to reactivate the vessel under Government job orders for an agreed price of $177,420. All of the work required to be done by Todd was necessary in order to render the vessel safe and seaworthy for navigation.

Upon receiving the vessel Todd opened up all the hatches in order that a survey of the holds could be made. The hatches were left open or partly open throughout the period of the vessel's reactivation in order to remove ship's gear, to make repairs, and to permit examination and inspection of the work in progress. Todd was in complete control of the vessel and its reactivation from the date of her arrival at its yard until a few days after the libelant sustained his injuries, during all of which time the vessel was not in navigation, although at some time prior to November 23, 1951 the vessel was in the water and tied up to a Todd dock.

On November 23, 1951, 75 to 80% of the repair work had been completed. The first dock trial of the main engine was held and revealed that the main engine was faulty to such an extent that the vessel was not yet fit to go to sea. Testing of the booms began on November 23, 1951 and was not completed until November 27, 1951. On November 23 the sextants, compasses, chronometers and clocks were not aboard; the lifeboats, although in place, were not equipped; the painting of the dock was not completed; other work remained to be done to render the vessel safe and seaworthy; the vessel had not yet had its final inspection, and it had neither a Certificate of Safety nor of Seaworthiness. It was not until November 27, 1951 that the Coast Guard made its inspection which resulted in the issuance of a temporary Certificate of Safety on November 28, 1951. No crew signed aboard the vessel until November 27, 1951.

The first issue which is presented by this record is that described by Judge Galston in McDaniel v. The M/S Lisholt, 2 Cir., 1958, 257 F.2d 538, at page 540:

"The libelant seeks to have the court extend to him the ship owner's absolute duty to provide a seaworthy ship, a duty traditionally owed to seamen who sail with the ship and who are subjected to the perils of the sea. The Osceola, 1902, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760. Following a dictum in that Supreme Court decision and influenced by a humanitarian policy, the courts have developed as part of the general maritime law a doctrine allowing recovery for injuries caused by the unseaworthiness of the vessel, imposing liability on the shipowner and the ship, and making this liability an absolute duty to provide a seaworthy ship. This doctrine has been made available to members of the crew, stevedores and shore-based workers who come aboard in the employ of independent contractors to perform the type of work traditionally done by seamen. Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Pope & Talbot v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143; Alaska S. S. Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798; Halecki v. United New York and New Jersey Sandy Hook Pilot's Association, 2 Cir., 251 F.2d 708, certiorari granted [357 U.S. 903] 78 S.Ct. 1149 [2 L.Ed.2d 1154]."

Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 65 S.Ct. 872, 880, 90 L.Ed. 1099, which extended the shipowner's warranty of seaworthiness to longshoremen employed by independent contractors engaged in loading or unloading a vessel, rests upon two principle grounds:

(1) The hazards of marine service which unseaworthiness places on the men who perform it, together with their helplessness to ward off such perils and the harshness of forcing them to shoulder alone the resulting personal disability and loss, have been the paramount influences dictating the shipowner's liability for unseaworthiness as well as its absolute character.

(2) The shipowner should not be free to nullify his absolute duty by parcelling out his operations to intermediary employers whose sole business is to take over portions of the ship's work, or by other devices which would strip the men performing its service of their historic protection. The Supreme Court held that for the purpose of the warranty of seaworthiness the longshoreman " * * * is, in short, a seaman because he is doing a seaman's work and incurring a seaman's hazards." Pope & Talbot v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 204, 98 L.Ed. 143, extended the right to sue for injuries caused by unseaworthiness to a shore-based carpenter. "Loading of the vessel with grain for a voyage had been temporarily interrupted to make minor repairs on the grain loading equipment. Hawn was doing carpentry work on this equipment to make it spread the grain evenly and thereby balance the ship's load to make the coming voyage safer." Hawn was put to work " * * * so that the loading [of the ship] could go on at once. There he was hurt. His need for protection from unseaworthiness was neither more nor less than the stevedores then working with him on the ship or of seamen who had been or were about to go on a voyage. All were subjected to the same danger. All were entitled to like treatment under the law."

The absolute liability imposed on a shipowner can, however, be extended to shore-based workers only if they are doing work traditionally done by seamen. In the McDaniel case, supra, the following appears:

" * * * We have stated that whether this special protection is afforded ' * * * depends upon whether the work on which the plaintiff was engaged was of a kind that the crew of a vessel was accustomed to perform.' Berge v. National Bulk Carriers Corp., 2 Cir., 251 F.2d 717, 718, certiorari denied 356 U.S. 958, 78 S.Ct. 994, 2 L. Ed.2d 1066. In that case we refused to extend the warranty of seaworthiness to a shore-based rigger engaged in work designed to be a virtual rebuilding of the interior of the vessel. In Berryhill v. Pacific Far East Line, 9 Cir., 238 F.2d 385, certiorari denied 354 U.S. 938, 77 S.Ct. 1400, 1 L.Ed.2d 1537, recovery was denied for the same reason to a workman engaged in major repairs aboard a dry-docked vessel."

The basis of this principle is apparent. As stated by Judge Murphy in Berge v. National Bulk Carriers, Inc., D.C.S.D. N.Y.1957, 148 F.Supp. 608, 611, affirmed 2 Cir., 1958, 251 F.2d 717, certiorari denied 1958, 356 U.S. 958, 78 S.Ct. 994, 2 L.Ed.2d 1066:

" * * * Since the whole rationale of Sieracki rests on the premise that a shipowner cannot escape its absolute obligation to provide a seaworthy vessel by contracting to have a third party perform the services traditionally performed by seamen, it becomes apparent that once the third party performs services different from those usually performed by seamen, the warranty of seaworthiness which was historically designed to protect seamen, need no longer apply. *Cessante ratione legis, cessat et ipsa lex.* * * * *"

In determining whether there was a warranty of seaworthiness running to an injured repair worker, the specific task being performed by such worker must be regarded in relation to the overall work being performed upon the ship, of which such task forms a part. It thus cannot be said that the libelant was protected by a warranty of seaworthiness simply because he was engaged in painting the ship and painting is part of the work customarily done by the crew. Amato v. United States, D.C. S.D.N.Y.1958, 167 F.Supp. 929. In Amato it was pointed out that to hold otherwise would mean that a job analysis would have to be made in a case involving the reconstruction of a vessel to determine whether any particular part of the reconstruction process was work which the crew was accustomed to perform, and that in a given case recovery could be denied to one worker engaged in a reconstruction project, and permitted to another who was standing next to him merely by the fortuitous circumstance of his trade or craft. This might be so even though both men were injured in the same accident.

In the case at bar the vessel was out of navigation, West v. United States, 3 Cir., 1958, 256 F.2d 671; Owens v. United States, D.C.S.D.Fla.1957, 1958 A.M.C. 216; Gonzales v. United States Shipping Board, D.C.E.D.N.Y. 1924, 3 F.2d 168, and had no crew. Logic dictates the conclusion that one employed in its reactivation was exposed to none of the hazards affecting the crew of a ship in navigation, and was not performing work customarily done by seamen. Compare also Union Carbide Corp. v. Goett, 4 Cir., 1958, 256 F.2d 449; Raidy v. United States, 4 Cir., 1958, 252 F.2d 117, certiorari denied 1958, 356 U.S. 973, 78 S.Ct. 1136, 2 L.Ed.2d

1147. The question of whether a vessel is in navigation at the time of the injury is of key significance in determining the nature of the repair work being performed thereon, and the existence of a warranty of seaworthiness. This conclusion flows from a recognition of the fact that the admiralty doctrine of unseaworthiness springs from a consideration of the particular hazards affecting the crew of a ship in navigation.[1]

The libelant's claim grounded upon the allegedly negligent failure of the respondent to provide him with a safe place to work cannot be sustained. This court held in Pedersen v. The Bulklube, 170 F.Supp. 462, that "What is spoken of as a shipowner's non-delegable duty to provide a safe place to work, see Palazzolo v. Pan-Atlantic S. S. Corp., 2 Cir., 1954, 211 F.2d 277, affirmed Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L. Ed. 133 where not clearly identical with the shipowner's duty to provide a seaworthy vessel, see Berti v. Compagnie de Navigation Cyprien Fabre, 2 Cir., 1954, 213 F.2d 397, is no more than a requirement that reasonable due care under the circumstances be exercised. * * * The shipowner's liability, if any, resting in negligence, control of the vessel during the progress of repair work must be regarded as a vital concomitant of such liability. Pioneer S. S. Co. v. Hill, 6 Cir., 1955, 227 F.2d 262." Compare Lyon v. United States, D.C.E.D.N.Y.1958, 163 F. Supp. 206. In the instant case there is no evidence whatever that the respondent created the defective condition which caused the libelant's injuries. Control of the vessel and of the manner in which repairs were made rested with Todd. Although at the time of and during the day preceding the accident employees of the respondent were aboard the vessel, it was the function of such persons only to

1. For a comprehensive discussion of the development of the doctrine of unseaworthiness, see Tetreault, "Seamen, Seaworthiness and the Rights of Harbor Workers," 39 Cornell L.Q. 381 (1954).

inspect completed repairs made by Todd to determine that they were made in accordance with the requirements of the contract. During the course of repair work the hatches were continually being opened and closed by Todd's employees, and only by Todd's employees, to permit Todd to perform various phases of its work. Respondent's employees had no knowledge of the defective condition, and, the court finds, the defect was not so open and apparent as to charge the respondent with knowledge or any obligation to warn Todd's employees of the existence thereof. Compare Amato v. United States, supra. As a matter of law, "a general ability to control the work in order to insure that it is satisfactorily completed in accordance with the requirements of the contract does not of itself make the hirer of an independent contractor liable for harm resulting from negligence in conducting the details of the work." Gallagher v. United States Lines Co., 2 Cir., 1953, 206 F.2d 177, 179, certiorari denied 1953, 346 U.S. 897, 74 S.Ct. 221, 98 L.Ed. 398. Libelant's injuries resulted solely from the manner in which the work was done by Todd. Since control of the details of the operation was left to Todd, and since respondent had no knowledge, and cannot be charged with knowledge, of the hidden defect, the respondent cannot be held for negligence in Todd's performance. Berti v. Compagnie de Navigation Cyprien Fabre, supra.

The foregoing shall constitute the court's findings of fact and conclusions of law. The libel and petition impleading Todd Shipyards Corporation are dismissed, without prejudice to the petition being raised again should the need arise. The parties will settle an appropriate decree and will submit such proposed additional findings of fact and conclusions of law as are deemed by them to be necessary.