**Joseph YOST, Libelant,**

v.

**GENERAL ELECTRIC COMPANY and United States of America, Respondents,**
and
**O'Brien Bros. Shipyard Corporation, Respondent-Impleaded.**

United States District Court
S. D. New York.
May 27, 1959.

Israel & Taubenblatt, New York City, for libelant. Jacquin Frank, New York City, of counsel.

Budd, Quencer & Commette, New York City, for General Electric Co. Albert S. Commette, New York City, of counsel.

Arthur H. Christy, U. S. Atty., New York City, for United States. Benjamin H. Berman, William A. Wilson, Robert D. Klages, New York City, of counsel.

Alexander, Ash & Schwartz, New York City, for O'Brien Bros. Shipyard Corp. Edward Ash, New York City, of counsel.

THOMAS F. MURPHY, District Judge.

This is a libel for damages for personal injuries suffered aboard the S. S. Bull Run while afloat in navigable waters at the shipyard of O'Brien Bros. in Staten Island, New York. Jurisdiction over the United States, the owner of the vessel, is under the Suits in Admiralty Act (46

U.S.C.A. § 741 et seq.) and General Electric, in admiralty on the theory of a maritime tort. The United States has filed a cross-claim over against O'Brien Bros. and it in turn has a claim over against General Electric.

There is little dispute about the accident or the injuries. Libelant, who was 65 years of age, is a well-built machinist. He was born in Alsace and became a citizen some time in the 1920's, and for many years worked as a machinist in shipyards. The S. S. Bull Run is a T–2 tanker built, according to its log, in 1943. It was purchased by the government from the City Service Oil Company in 1954, deactivated and placed in the moth ball fleet in the James River for two years until October 1956, when it was towed to the Todd Shipyards in Hoboken, New Jersey, where the hull was painted. It was then towed to Staten Island to the shipyards of the impleaded respondent, O'Brien Bros., for general overhauling and reactivating at a cost of $250,000. At the time of the accident its boilers were not operating, there was no steam, all power came from the shore, the main generator had to be renewed—it was a "dead" ship. The only crew it had was a master and first officer, chief engineer and first assistant, none of whom had signed articles but were on the port payroll of the general agents of the United States. There was no testimony as to what the duties of the master and first officer were but the duties of the chief engineer and his assistant were to inspect the repair work as it progressed. The United States Maritime Commission also had on board a Mr. Brinkley, who held a chief engineer's license, and was its surveyor. It was his job to inspect everything and to make specifications for the work to be done. Pursuant to those specifications the United States entered into a contract with O'Brien, part of which required the turbo generator to be inspected and repaired if necessary. This was to be done by removing the head casing and the rotor under the supervision of General Electric. General Electric was not a party to this contract but it did, pursuant to an oral request of the shipyard, send its expert to advise and was paid for his services.

The United States Maritime surveyor knew that the O'Brien people were going to inspect the generator and also knew that they would probably use the chain hoist in the engine room which was originally installed for just that purpose, nevertheless he made no inspection of it nor of the eye beams on which it travelled other than to casually look at them.

A day or two before the accident the General Electric expert arrived and under his guidance the machinists and the riggers of O'Brien started the removal of the head casing. This was slow and rather exacting work. After the bolts were removed and the head raised a fraction of an inch by jack screws, it was lifted by the chain hoist and left suspended for about an hour for the purpose of testing the strength and integrity of the hoist. The hoist and eye beam each had a 10-ton capacity with some additional safety factor. The head of the casing weighed between eight and nine tons. Subsequently, the head was removed and by means of a trolley on the overhead eye beam it was suspended on the hoist and moved to a position on the port side of the engine room where it was secured by cables to the overhead. Thereafter the hoist was used to remove the rotor. After inspection the rotor was lowered into position by use of the hoist and then the riggers and the machinists, under the guidance of the General Electric expert, started the process of returning the head casing to a position immediately over the generator and then lowering it into position. This was done first by the installation of guide rods to insure plumb lowering. The O'Brien men secured the head on chocks of heavy timber, thus taking the tension off the hoist.

In the afternoon of the day of the accident the O'Brien men started to lower the head by first taking a strain on the hoist and removing the wooden chocks, and then lowering it slowly inch by inch into position. This required an exactness

so that the multiple inside parts would mesh correctly. The libelant took a position on one side and the General Electric expert on the other with the rigger operating the operating chain at the apex of the triangle formed by the three men. The libelant and the General Electric man necessarily had to look under the head of the casing to see that nothing was fouled and then the head would be lowered another inch or so. When the head was about 25 inches from reaching its opposite part the libelant crouched down and with the aid of a searchlight looked under the head and in doing so rested his hands on the bottom flange. Suddenly the chain failed, the head crashed down pinning his left arm and right hand beneath it. As a result libelant suffered the loss of that part of his left arm two inches below his elbow and four of the middle and distal phalanxes of four fingers of his right hand, the only finger remaining intact being his fourth. Libelant did not contribute in anywise to his accident. He remained in the Staten Island Hospital for just a month and understandably suffered great pain and still suffers from phantom pain. Sometimes he wears a prosthesis on his left arm. He has been unable to pursue any gainful employment since the accident. In the last two years prior to his accident he earned, in 1955, $3,800, and in 1956, $4,000. The rate of pay was high but he took time off to build his own house and to go to Europe.

■ On the issue of damages, assuming there is liability, it is obvious that libelant was seriously injured without being contributorily negligent and is completely handicapped. Considering his age, his earnings at the time, the prospect of his working life expectancy, the medical bills (which incidentally were paid by the compensation carrier) we find as a fact that his total damages are $125,000.

Whether libelant is entitled to recover the damages he sustained is the principal problem. That this was an industrial accident and that libelant has been com-pensated by Workmen's Compensation, and his medical bills paid by the insurance company are, under our system of jurisprudence, only incidental economic facts. We are limited in our consideration to the question of whether he has a claim against either of the two respondents and, if so, whether there is any validity to the respective cross-claims over on the theory of indemnity.

■ First consideration should be given to the liability, if any, of General Electric under general maritime law. Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 628, 79 S.Ct. 406, 3 L.Ed.2d 550. General Electric neither owned the ship nor any of the gear. It was present at the request of the shipyard company to advise concerning the inspection and repair, if necessary, of one of its products. We accept as a fact the testimony of the employee of General Electric, Mr. Callan, that he gave not directions but only advice and that the men who physically lifted the head of the generator and were in the act of lowering it at the time of the accident were skillful and competent machinists and riggers. The only obligation that General Electric had toward libelant and, incidentally, toward the shipbuilder, O'Brien, was to give competent and expert advice and owed no other duty to libelant other than to refrain from intentionally hurting him. It is sued herein on the theory that it was negligent in not inspecting the hoist and in not advising libelant to be careful. No authority has been called to our attention, nor have we found any to sustain this theory.

We find as a fact and conclusion of law that it was under no such duty and committed no actionable wrong, and is entitled to a decree dismissing the libel.

What then is the liability, if any, of the United States. They were the owners of the vessel and it was their gear that was being used. Libelant was aboard as a business invitee to do work on behalf of his employer who was engaged to do a complete overhauling of the entire ship, not alone the engines. The United States is sued on alternate

theories of negligence and unseaworthiness.

■ If the vessel was unseaworthy because of the failure of the chain hoist or the eye beam from which it was suspended we would be relieved of the problem of deciding whether the United States was negligent since unseaworthiness is a species of liability without fault. Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561; Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Alaska S.S. Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798; Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143.

Under the undisputed facts here disclosed we hold that the United States as owner of a "dead" ship was under no duty to provide a seaworthy vessel to those people like libelant who were engaged not in seamen's work but in major repair work undertaken to render the vessel seaworthy and return it to navigation. United New York and New Jersey Sandy Hook Pilots Association v. Halecki, 358 U.S. 613, 79 S.Ct. 517, 3 L. Ed.2d 541. See footnote 7, at page 618 of 358 U.S., at page 520 of 79 S.Ct. wherein the court did not reach the general proposition presented by the United States as *amicus curiae.* Berge v. National Bulk Carriers Corp., 2 Cir., 1958, 251 F.2d 717, certiorari denied 356 U.S. 958, 78 S.Ct. 994, 2 L.Ed.2d 1066; Berryhill v. Pacific Far East Lines, 9 Cir., 1956, 238 F.2d 385, certiorari denied 354 U.S. 938, 77 S.Ct. 1400, 1 L.Ed.2d 1537; McDaniel v. M/S Lisholt, 2 Cir., 1958, 257 F.2d 538 new trial ordered on other grounds, 1959, 359 U.S. 26, 79 S.Ct. 602, 3 L.Ed.2d 625; West v. United States, 3 Cir., 1958, 256 F.2d 671, certiorari granted, 1959, 359 U.S. 924, 3 L.Ed.2d 627.

Alternately the United States was negligent, libelant argues, because it failed to provide him with a safe place to work. This is just another way of saying that it failed to act as the reasonably prudent ship owner would have acted under like or similar circumstances. Libelant argues that the reasonable and prudent ship owner, knowing that its gear and appliances were to be used in the lifting and replacing of an extremely heavy and awkward piece of equipment, would have made an inspection of some kind which would have disclosed to it the unsafe character of the equipment.

The facts relative to inspection before and after the accident and the expert opinion relative to the cause of the accident are as follows:

Mason, the chief engineer, looked at the chain hoist before the accident; he did not examine it closely; he testified it was partly covered with some anti-corrosive substance and noticed some rust mixed with the preservative; he manually operated the chain hoist without any load and concluded that it was in working condition; he knew it had to be used to raise the casing; after the accident he examined the chain closely and observed considerable corrosion on the links where they joined each other; he also looked at the links where they parted and saw corrosion there.

Brinkley, the surveyor for the United States Maritime Commission, made only a casual inspection and noticed that the anti-corrosive preservative had not been completely removed from the chain; he, too, knew the casing would be lifted with the chain hoist.

Callan, the General Electric expert, made no inspection other than a casual one; he, too, observed that it was covered with some preservative and saw signs of some corrosion and rust.

The two O'Brien riggers made no particular link by link examination; they each thought it looked all right although "kind of rusty" in spots and saw some preservative on it. These O'Brien men applied the only physical test and that was by suspending the head casing on the chain hoist for about an hour. This satisfied them of the chain's integrity and conformed to what they had done in the past in removing similar head casings.

The president of O'Brien testified by deposition that there are several tests to determine a chain's safe capacity, including a test whereby one-and-a-half to two times the anticipated weight is lifted by the chain, and another involving the use of scales. No such tests were made and ordinarily would not have been unless specifically requested.

Did the United States, the ship owner, under the facts here disclosed fall below the standard of the reasonable and prudent ship owner under like or similar circumstances? It knew that work on the turbo generator was to be performed and that it would be performed with the aid of the chain fall and trolley which was part of the ship's permanent equipment. It was, therefore, the supplier of the equipment and upon such person the law imposes an obligation to use proper care and diligence to see that such instrumentalities are safe and suitable for the purpose. Due care implies the use of such vigilance as is proportional to the danger to be avoided, judged by the standard of the prudent and experienced ship owner. The danger to human life in removing and replacing an eight to nine ton head casing must have been apparent and readily appreciated.

There is no dispute that not only one of the links in the chain hoist failed but also both the lower flange of the eye beam upon which the hoist was suspended and the vertical part of such eye beam bent and became distorted. Libelant's expert testified that the beam failed first and such failure in turn caused the chain to part, albeit all within a matter of some fraction of a second. Causationwise then it would appear that the tragedy started with some imperfection in the beam although it is true, the same expert said, that such imperfection would not have caused a perfect chain to snap.

The case law is replete with similar accidents but analogous cases are not of too much assistance. Each case in its ultimate setting poses a question of fact and only the rule of law is constant. In The Rheola, C.C.S.D.N.Y.1884, 19 F. 926, a chain hoist failed and the ship owner was held liable. No inspection had been made and a similar chain had failed the day before. In Foster v. Bucknall S. S. Lines, Ltd., 2 Cir., 1913, 206 F. 415 a guy rope failed after having been in use only 28 days, causing the death of a stevedore. Holding the ship owner liable the court felt that there was sufficient evidence to indicate that a careful inspection would have revealed the defective condition. In The Drummond, D.C.Penn. 1902, 114 F. 976 a chain failed due to imperfect welding. In exonerating the ship owner the court felt that the link by link inspection by the ship's officers was all that could be required under the circumstances. There the chain was $1\tfrac{1}{16}''$ and had been in use for several years without repairs except once before the accident when a link broke and was replaced. At the time of the accident it was holding a load of about one ton although its capacity was between three and four tons. It should be recalled that in the instant case there was no link by link inspection and the respondent apparently had no knowledge of the chain's prior history, or at least none was proved, plus also the fact that the casing head here involved was extremely close to the chain's capacity. In Johnston v. Turnbull, D.C.Penn.1903, 124 F. 476 a defective weld in a chain caused injury to a longshoreman. Here, too, there was a link by link inspection prior to the accident and the chain had been previously employed in arduous lifting tasks. The court held that the defect could not have been detected by an eye or touch testing. In The Mercier, D.C.D. Or.1933, 5 F.Supp. 511 a shackle that failed was involved. In exonerating the ship owner the court relied on the fact that numerous inspections had been made including careful inspection by the court itself, compelling the conclusion that the defect was latent and undiscoverable.

Assuming that the inspection of the chain by the two government men was insufficient and respondent can be charged with the failure to observe prop-

636

er care, can the inspection by the O'Brien riggers (suspending the head casing for an hour without incident) inure to the benefit of the ship owner and, if it can, was such a test commensurate under the circumstances with the obligation owed to libelant. Assuming, without deciding, that such test did inure to the benefit of the United States, we think it was insufficient to satisfy the ship owner's duty to libelant. The most it proved was that for one hour the chain did not break while suspending a weight of between eight and nine tons. It did not test or prove what would or could happen for a longer period of weight lifting, or what would happen when movement and other lateral pressure took place. The evidence shows that no test other than such suspension test was made to determine whether the chain fall was safe for the use intended. The government ship owner supplied a chain hoist with an expressed capacity of ten tons and thereby impliedly warranted to those whom they knew would be using it that it was safe to use not only in lifting ten tons but moving it about as the work required. Employees of O'Brien, such as libelant, working in close proximity to the weight suspended from that hoist were invited to rely on that warranty and had a right to assume that the supplier had adequately tested it so as to be able to reasonably make that warranty. Knowing that the vessel had been in "moth balls" for about two years and knowing that the ship had been built in 1943 it was charged with the knowledge of the extreme hazard that would be created were the chain defective, yet it contented itself with a casual inspection of a chain partly covered with a preservative. While it is true that failure to make inspection did not constitute negligence unless inspection would have disclosed the defect (Hook v. National Brick Co., 7 Cir., 1945, 150 F.2d 184, Restate-

ment, Torts § 300, comment c (1934)) the facts here disclose that a link by link inspection would have revealed corrosion of the links, particularly where they joined each other. Such inspection would have prompted other and further testing like those suggested by O'Brien, and we feel would have revealed the defective link and prevented the tragedy.

Accordingly, we find that the United States was negligent and that it failed to exercise that degree of care which the ordinary and prudent ship owner would have exercised under the same or similar circumstances.

Therefore, libelant is entitled to judgment against the United States in the sum of $125,000.

■ Insofar as the United States seeks indemnity from O'Brien because of its written contract and implied warranty of workmanlike performance, that claim is dismissed. The written contract contains no indemnity agreement based on negligence of the United States. On the issue of implied warranty of workmanlike performance we are satisfied that the slight visual inspection and examination of the chain by the employees of O'Brien, in addition to the suspension test that was made by them, would be sufficient to satisfy the duty owed by O'Brien inasmuch as they were not the suppliers of the equipment and to some extent were entitled to rely on the implied representation of the ship owner. That would defeat the claim of the United States for indemnity-over against it. See Ignatyuk v. Tramp Chartering Corp., 2 Cir., 1957, 250 F.2d 198, 201; see, too, Liverani v. John T. Clark & Son, 1921, 231 N.Y. 178, 131 N.E. 881. In view of this holding the cross-claim of O'Brien against General Electric is dismissed as moot.

Decree accordingly.