James LUPO, Jr., Plaintiff,

v.

CONSOLIDATED MARINERS, INC., Shipenter Lines, Inc., Shipping Enterpriser Inc. and Shipping Enterpriser of New York, Inc., Defendants.

No. 63 Civil 2638.

United States District Court
S. D. New York.

June 14, 1966.

Sheldon Tabak, New York City, for plaintiff.

Dougherty, Ryan, Mahoney & Pellegrino, New York City, for defendants; Robert J. Giuffra, New York City, of counsel.

TENNEY, District Judge.

## OPINION

This is a personal injury action arising out of an alleged accident which occurred aboard the "S. S. TADDEI VILLAGE" on August 19, 1963. The complaint alleges negligence under the Jones Act (46 U.S.C. § 688) and the unseaworthiness of the vessel under the General Maritime Law.

The case was tried before the Court as trier of fact and law. At the behest of both parties the first and only issue tried and to be decided at this juncture is whether the "S. S. TADDEI VILLAGE" was at the time of the alleged accident a vessel in navigation.

■ Plaintiff is a resident and citizen of the State of New York, and while defendant is a corporation organized and existing by virtue of the Laws of Delaware, its principal place of business is 19 Rector Street, New York City. Accordingly, there is no diversity of citizenship between the parties. (See 28 U.S.C. § 1332(c) (Supp.1965)).

Counsel have agreed that if no diversity jurisdiction exists, the case be transferred to the admiralty side of the Court and a determination be made whether the vessel, at the time of the accident, warranted its seaworthiness, and/or whether Lupo (now libelant) would be entitled to the benefits of the Jones Act.

■ In approaching a consideration of the issues presented, it must be borne in mind that in order for Lupo to be in a position to assert the causes of action he asserts herein, there must be a concurrence of at least two factors: (1) a vessel in navigation, and (2) a seaman in being. (Kissinger v. United States, 176 F. Supp. 828, 832 (E.D.N.Y.1959)). This is a prerequisite both under the unseaworthiness claim as well as the Jones Act cause of action, (Roper v. United States, 368 U.S. 20, 23–24, 82 S.Ct. 5, 7 L.Ed.2d 1 (1961)), and if there be no vessel in navigation the claims must fail, irrespective of what type of work the injured party was doing.[1]

As trier of fact on the issue of whether the vessel was in navigation, based on the documentary evidence and testimony presented before me, I find the facts to be as follows:

1) The "S. S. TADDEI VILLAGE" (hereinafter referred to as "TADDEI" or "vessel") was purchased by Consolidated Mariners, Inc. (hereinafter referred to as "defendant"), at a United States Marshal's sale held pursuant to the order of the United States District Court for the Eastern District of New York on July 30, 1963.

2) The TADDEI was an American flag C–2 dry cargo vessel, formerly named the "S. S. EMELIA". She was owned and operated by the A. H. Bull Steamship Company until that company went bankrupt.

3) At the time of purchase the vessel was and had been moored for six months (since December 1962) at Pier 3, Erie Basin, foot of Columbia Street, Brooklyn, New York. For that period of time she was without any crew in an unmanned status, except for some security personnel tending heating devices and refrigeration units.

4) Defendant took possession of the vessel on August 1, 1963. She was then towed without steam and power by tug to Todd Shipyards, Brooklyn, New York.

5) Before the vessel was purchased by defendant the Certificate of Inspection of the vessel (at the time still the "S. S. EMELIA") had been revoked by the

1. See generally, Annot. 7 L.Ed.2d 853 (1962) (status of the vessel "in navigation" as a prerequisite of the applicability of the doctrine of unseaworthiness).

United States Coast Guard on July 9, 1963. The revocation was based on the need for boiler repairs.

6) A provisional Coast Guard Certificate of Inspection permitting the vessel to proceed to Baltimore for completion of boiler repairs, but without cargo, and passengers, was not issued until September 3, 1963 * after the repairs hereinafter set forth had been made at Todd Shipyards.

7) It was not until September 5, 1963 that the Coast Guard Certificate of Inspection was returned to the vessel at the port of Baltimore, Maryland.

8) At the time of purchase there was in existence no Safety Radiotelegraphy Certificate for the TADDEI. This certificate was issued by the Federal Communications Commission on September 4, 1963.

9) The Certificate of the American Bureau of Shipping, without which the vessel could not sail, was issued on September 4, 1963.

10) The deratization certificate of the vessel had expired prior to August 1, 1963. A new one was not issued by the United States Public Health Service until September 1963.

■ 11) Thus, on the dates in question (August 1 and August 19), the vessel did not have any of the documents which are prerequisites for its operation.[2]

12) When the vessel was shifted by tug from Erie Basin to Todd Shipyards on August 1, and until the beginning of September, 1963, there were no ship's articles for the vessel; no master, officer or crew on the vessel; no habitable sleeping quarters, eatable stores, sanitary facilities or linen aboard; no usable charts or maps, and no log book being kept or even opened.[3]

13) The ship's articles were not opened until September 3d or 4th, at which time the Master, Chief Mate, Chief Engineer, and the rest of the members of the crew came on board.[3]

---

* A certificate was returned to the vessel on August 30 solely for documentation purposes.

2. The absence of certification is, of course, by no means determinative of the status of the vessel. Hercules Co. v. Brigadier Gen. Absolom Baird, 214 F.2d 66 (3d Cir. 1954); Scudero v. Todd Shipyards Corp., 1964 A.M.C. 403 (S.Ct.Wash.1963). However, the fact that the vessel had no certificates at all—that she was unable to operate without these documents, and the reasons for the lack of certification, makes this a factor of significance which, in the totality of circumstances presented supra, should be considered in reaching the factual determination.

The Court, in Latus v. United States, 170 F.Supp. 837, 839 (E.D.N.Y.1959), aff'd, 277 F.2d 264, 266 (2d Cir.), cert. denied, 364 U.S. 827, 81 S.Ct. 65, 5 L.Ed. 2d 55 (1960), in making its factual finding that the vessel was not in navigation, specifically referred to the absence of Coast Guard certification as a factor. See Roper v. United States, 368 U.S. 20, 21, 82 S.Ct. 5, 7 L.Ed.2d 1 (1961); Butler v. Whiteman, 356 U.S. 271, 272, 78 S.Ct. 734, 2 L.Ed.2d 754 (1958) (Dissenting opinion, per Mr. Justice Harlan); cf., Hawn v. American S. S. Co., 107 F. 2d 999, 1000 (2d Cir. 1939); see also Pederson v. The Bulklube, 170 F.Supp. 462, 464 (E.D.N.Y.1959), aff'd on the opinion below, 274 F.2d 824 (2d Cir.), cert. denied, 364 U.S. 814, 81 S.Ct. 44, 5 L.Ed.2d 46 (1960).

Indeed, in Harris v. Whiteman, 243 F. 2d 563 (5th Cir. 1957), the Court of Appeals affirmed the lower court's direction of a verdict in favor of the defendant, ruling as a matter of law that the vessel was a dead ship. In that case, the vessel had not raised steam during 1953, had no Coast Guard certificate permitting it to operate, no crew, and the individual was employed as a laborer on an hourly wage basis. The Supreme Court reversed the decision, sub nom. Butler v. Whiteman, 356 U.S. 271, 78 S. Ct. 734, 2 L.Ed.2d 754 (1958), holding that the case presented a question of fact for the jury's determination. It must be borne in mind, however, that in the case at bar this Court sits as trier of the fact, and as such I consider these factors to be of significance. See Roper v. United States, 170 F.Supp. 763, 768 (E.D.Va.1959), aff'd, 282 F.2d 413 (4th Cir. 1960), aff'd, 368 U.S. 20, 82 S.Ct. 5, 7 L.Ed.2d 1 (1961).

3. In the following cases, the vessels in question were found not to be in navigation, notwithstanding the fact that

14) Defendant expended approximately $34,000 to put sufficient stores aboard the vessel.

15) The vessel did not generate during the period set forth in finding 12, supra, any heat, light or power and had no operable water facilities. All these utilities were supplied from ashore.

16) The vessel first generated her own steam on September 2d or 3d, 1963, and consequently until that time the rudder, cargo ventilators and pumps, which depend on steam power, were inoperable.

17) As a result of the vessel's not having been moved or used [a] for a six-month period, her decks, holds and quarters were in a state of disarray with debris strewn over the ship, and vermin, rats and mice in her holds and compartments and, indeed, infesting the entire vessel.

18) The . cleaning and maintenance work which was occasioned by the extended period that the TADDEI lay at Erie Basin was performed by the Hercules Maintenance Company at a cost of approximately $7,445, and by individuals

there was present a master and/or crew. Kissinger v. United States, 176 F.Supp. 828, 829–830, 832 (E.D.N.Y.1959) (master, crew of six, ship's log being kept and men handling lines); Yost v. General Elec. Co., 173 F.Supp. 630, 632 (S.D. N.Y.1959) (crew consisted of a master, first officer, chief engineer and assistant engineer, none of whom had signed articles); Moon v. United States, 197 F. Supp. 406, 408 (E.D.N.Y.1960); Allen v. United States, 178 F.Supp. 21, 24 n. 3 (E.D.Pa.1959) (crew subject to 50 percent rotating leave, slept on board); La Franca v. United States, 1965 A.M.C. 2019, 2021 (S.D.N.Y.1965) (two-thirds of the crew on board, standing routine watches, and performing certain cleaning, repairing and record-keeping functions); McQuaid v. United States, 337 F.2d 483, 484, 485 (3d Cir. 1964) (crew of the vessel berthed ashore and all meals eaten ashore). Cf., Hawn v. American S. S. Co., supra, 107 F.2d at 1000 (licensed master and six men to haul lines), whereas in Lawlor v. Socony-Vacuum Oil Co., 275 F.2d 599, 84 A.L.R.2d 613 (2d Cir.), cert. denied, 363 U.S. 844, 80 S.Ct. 1614, 4 L.Ed.2d 1728 (1960), the presence of a full crew of officers and men performing a seamen's duties was a factor which the Court considered of importance in attaching liability. (Id. at 601, 604.); Roper v. United States, supra, 368 U.S. at 23–24 n. 2, 82 S.Ct. 5, 7 L.Ed.2d 1; see Morrell v. United States, 193 F.Supp. 705, 707 (N.D.Cal.1960), aff'd, 297 F.2d 662, 664 (9th Cir.), cert. denied, 370 U.S. 960, 82 S.Ct. 1615, 8 L. Ed.2d 826 (1962); Hilton v. Aegean S. S. Co., 239 F.Supp. 268 (D.Ore.1965); Allen v. Union Barge Line Corp., 239 F. Supp. 1004 (E.D.La.1965). Cf., DeFiore v. American S. S. Co., 110 F.Supp. 427 (W.D.N.Y.1952).

On the other hand, the absence of a crew and/or the other factors set forth

in findings 12 and 13, supra, taken in the context of a vessel lying dormant for six months and being refurbished for voyage is a factor to be considered in determining the status of the vessel. See West v. United States, 143 F.Supp. 473, 479 (E.D.Pa.1956), aff'd, 256 F.2d 671, 673 (3d Cir. 1958), aff'd, 361 U.S. 118, 119, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959); Roper v. United States, 170 F.Supp. 763, 766 (E.D.Va.1959), aff'd, 282 F.2d 413, 417 (4th Cir. 1960), aff'd, 368 U.S. 20, 23, 82 S.Ct. 5, 7 L.Ed.2d 1 (1961); Latus v. United States, 170 F.Supp. 837, 839, 841 (E.D.N.Y.1959), aff'd, 277 F.2d 264, 265–266 (2d Cir.), cert. denied, 364 U. S. 827, 81 S.Ct. 65, 5 L.Ed.2d 55 (1960); Noel v. Isbrandtsen Co., 287 F.2d 783, 784 (4th Cir.), cert. denied, 366 U.S. 975, 81 S.Ct. 1944, 6 L.Ed.2d 1264 (1961); Yost v. General Elec. Co., supra, 173 F. Supp. at 632 (S.D.N.Y.1959); Butler v. Whiteman, supra, 356 U.S. at 272, 78 S. Ct. 734, 2 L.Ed.2d 754 (Dissenting opinion, per Mr. Justice Harlan); cf., Desper v. Starved Rock Ferry Co., 342 U.S. 187, 190, 72 S.Ct. 216, 96 L.Ed. 205 (1952); Nelson v. Greene Line Steamers, Inc., 255 F.2d 31, 33 (6th Cir.), cert. denied, 358 U.S. 867, 79 S.Ct. 100, 3 L. Ed.2d 100 (1958); Antus v. Interocean S. S. Co., 108 F.2d 185 (6th Cir. 1939); Raidy v. United States, 153 F.Supp. 777, 778, 781 (D.Md.1957), aff'd, 252 F.2d 117, 118 (4th Cir.) (Per curiam), cert. denied, 356 U.S. 973, 78 S.Ct. 1136, 2 L. Ed.2d 1147 (1958); see also Seneca Washed Gravel Corp. v. McManigal, 65 F.2d 779, 780 (2d Cir. 1933). Compare Bodden v. Coordinated Caribbean Transp. Inc., 249 F.Supp. 561, 563 (S.D.Fla. 1965).

a. There is some testimony that cargo was discharged in July 1963 by use of electric winches, but aside from that operation she lay dormant.

(such as Lupo) who were hired through the Seafarers' International Union (hereinafter referred to as "SIU").

19) The disarray existing aboard the vessel is indicated by the extent and nature of the work performed by the Hercules people as set forth in defendant's Exhibit D. Suffice it to say that by reason of the filth, debris, dunnage, oil, corrosion, stagnant water, rats and mice, and other miscellaneous conditions, the maintenance work was not the type done during an "annual" overhaul.

20) There were six to eight men of the Hercules Company working aboard the vessel under the direct supervision and immediate control of a Hercules foreman. The work was checked by Anthony Sablic, an officer of defendant corporation. Sablic outlined the work that had to be done and checked that which had been completed.[b]

21) On the first day there were approximately eight men aboard the TADDEI, doing cleaning and maintenance work, who were hired from the Union Hall, Lupo among them. They had no foreman and were directly supervised by Sablic.[c]

22) These men were paid union scale, as was one Jonathan Held, who was doing the same type of work but was not hired from nor a member of the SIU.

23) The "union" men were free to come and go as they pleased and were not subject to any "ship's" discipline, and, indeed, of the eight men who came the first day, only four returned thereafter.[4]

24) If Lupo worked on Saturdays he did not receive overtime pay nor were any SIU pension benefits paid by defendant as is required by the SIU contract and as would have been the case if Lupo were a member of the crew.[d]

25) None of these men was hired by defendant with the intent of remaining aboard as part of the crew when and if the vessel sailed, and indeed none did so remain.

26) Lupo neither ate nor slept on the TADDEI. The quarters on the vessel were not habitable, and were unsanitary and unclean, and consequently no one ate or slept on the vessel. Indeed, there were no sanitary facilities in operation and all water was pumped from ashore.

27) The repair and reconditioning of the vessel's machinery was done by Todd Shipyards Corp. There were some 25 to 30 Todd employees on the vessel under the direction and control of a Todd supervisor. These men did the necessary work, the cost of which was $61,033 (after adjustment from $80,000).

28) The vessel, while at Todd, was drydocked for two days, some of her bottom valves renewed and overhauled, and repairs done to her rudder and rudder parts before being refloated in navigable waters and moored to the Todd dock.

■■ Pursuant to the "Certificate" revocation, work was required to be performed on the boilers and the propulsion machinery of the vessel. The extent of the work is indicated on pages 4–7 of the

b. While many cases discuss the question of control, I believe that the issue of control over the work is significant, not as much in determining whether the vessel is in navigation as in determining whether liability should attach. Thus, for example, if a shipowner is readying his ferryboats for resumption of service, after winter lay-up, even if he were telling each man what to do I doubt whether this would effect a change of status of the vessel. Nelson v. Greene Line Steamers, Inc., 255 F.2d 31, 33 (6th Cir.), cert. denied, 358 U.S. 867, 79 S.Ct. 100, 3 L. Ed.2d 100 (1958).

c. See note at bottom of Page 7.

4. See Owens v. United States, 1958 A. M.C. 216, 224 (S.D.Fla.1957).

d. While I do not consider the findings 21–24 of great significance, they are set forth to neutralize Lupo's argument that great weight should be attached to the fact that he was hired through the SIU Hall. The reasons for employing this hiring procedure were outlined by Sablic and in any event this fact is more than neutralized by the other facts noted supra and infra. See also, Perez v. Marine Transp. Lines, Inc., 160 F.Supp. 853, 854 (E.D.La.1958).

Todd bill, which is a part of defendant's Exhibit D. In addition, the No. 1 main condensate pump had to be dismantled and completely overhauled. The bill above referred to and Sablic's testimony indicate the items that had to be replaced, overhauled or renewed and other labor performed. While concededly many of the items taken *in vacuo* may not have constituted a "major" repair, this is far from determinative. It is the need for repair to all these items, occurring at the same time, taken in the context of a vessel laid up and inert for six months without any of the necessary certification (and indeed the Coast Guard Certificate having been revoked because of the need for boiler repairs) which makes the repairs so significant and which causes me to believe that this vessel was at the times in question not a vessel in navigation.[5]

5. One of the more elusive concepts in admiralty law is that of a vessel "in navigation" and similarly difficult of delineation are the determinative criteria which require a finding of a vessel "in navigation" or not "in navigation".

Indeed, this may very well be the reason that the Supreme Court has consistently held that the question of the status of the vessel is one of fact to be left to the finder of the facts (whether court or jury) and has thus reversed those decisions wherein the trial court has taken the case from the jury, usurping its function, and has made a determination of the status of the vessel as a matter of law. See, e.g., Butler v. Whiteman, 356 U.S. 271, 78 S.Ct. 734, 2 L.Ed.2d 754 (1958), and cases cited therein.

Manifestly, our case is not one of a vessel having finished its voyage and having repair done preparatory to resuming business again (West v. United States, supra, 256 F.2d at 673), nor is this a vessel undergoing its annual overhaul. Lawlor v. Socony-Vacuum Oil Co., supra.

If one common denominator may be culled from the many cases on the subject, it is that there is no one factor which outweighs all others and is determinative; it is rather the totality of circumstances presented in each individual case.

Thus, for example, the dollars and cents analysis which libelant presses, while being instructive, is far from determinative. The vessel was found to be in navigation in *Lawlor*, supra, where $70,000 was expended, and in Hilton v. Aegean S. S. Co., 239 F.Supp. 268 (D.Ore. 1965), where $65,000 was expended, whereas in Rizzi v. Empresa Hondurena De Vapores S. A., 253 F.Supp. 781 (E.D. N.Y. May 3, 1966, per Bruchhausen, J.) the repairs were in the area of $90,000— but the vessel was found not to be in navigation. Similarly, in Latus v. United States, supra, the contract price was $177,420 and in Owens v. United States, supra, $112,390; and in Tug M/V Tideland, 257 F.Supp. 45, A.M.C. 293 (E.D. La.1966) a mere $17,069—not very much when compared to the $1,000,000 in Allen v. United States, note 3, supra, or $800,000 in *La Franca*, note 3, supra; but nonetheless in all these cases the vessels were found not to be in navigation.

Moreover, the cost analysis completely breaks down when we consider the ferry or excursion boat cases, where in either preparing the vessels for winter or for the new season not very much in dollars and cents is expended, but nevertheless the vessels are classified as not in navigation. See Nelson v. Greene Line Steamers, Inc., 255 F.2d 31 (6th Cir.), cert. denied, 358 U.S. 867, 79 S.Ct. 100, 3 L.Ed.2d 100 (1958); cf. Desper v. Starved Rock Ferry Co., 342 U.S. 187, 72 S.Ct. 216, 96 L.Ed. 205 (1952); Antus v. Interocean S. S. Co., 108 F.2d 185 (6th Cir. 1939); Taylor v. McManigal, 89 F.2d 583 (6th Cir. 1939); Seneca Washed Gravel Corp. v. McManigal, 65 F.2d 779 (2d Cir. 1933).

It is no doubt true that the pattern, nature and extent of the repairs are matters to be considered, but, again, they are not in and of themselves determinative.

The excursion and ferry boat cases just cited, wherein the repairs were neither extensive nor structural, and indeed were in a sense "annual", indicate that this is but one of the criteria. See also, Union Carbide Corp. v. Goett, 256 F.2d 449 (4th Cir. 1958), vacated on other grounds, 361 U.S. 340, 80 S.Ct. 357, 4 L.Ed.2d 341 (1960) (Per curiam).

In addition, in Latus v. United States, supra, the accident occurred less than a week before all the work was complete, and at a time when 80 percent of the repairs had been done, and what remained did not involve a structural repair or even major overhaul, but the vessel was nonetheless not in navigation. Similarly, in Bodden v. Coordinated Caribbean Transp. Inc., supra, 249 F.Supp. at 562, the injury occurred on December 4th (plaintiff signed articles on November 30) and the vessel was ready for service on

29) Similar considerations exist with respect to the repairs required on the navigational instruments set forth in Exhibit D or the repairs to the Hagen

Board, radio equipment, smoke detection equipment, refrigeration units, etc. Again it is these repairs having to be made at the same time as those in find-

December 7th; and in McQuaid v. United States, 337 F.2d 483 (3d Cir. 1964), while the overall contract price was in excess of one million dollars, the accident occurred only three days before the vessel left the repair yard; Owens v. United States, note 4 supra (5 days before the repairs were complete).

In *Lawlor*, supra, the Court laid down the following test:

"We have concluded that the character of the work to be done by the shipyard, the presence or absence of a crew performing the customary work of seamen on shipboard, and the consequent measure of control or lack of control by the shipyard over the vessel as a whole, are the determining factors that rule the decision of this case."

275 F.2d at 604. However, the Court was quick to note both prior and subsequent to the statement that there are many variables and in some cases the existence or non-existence of certain criteria will gain prominence over others, whereas in other cases other criteria will be significant.

It appears to the Court that in a case such as this, falling in the gray area in the middle, attention must focus on the nature and extent of the repairs and the presence or absence of indicia of a viable vessel in navigation (crew, officers, articles, log, certification, etc.) taken in the context of the condition of the vessel at the time of the initiation of repairs, and, of equal importance, its status and condition immediately prior thereto (laid up for the winter, mothball, inoperative for a considerable period of time).

In the case at bar, as noted in the findings of fact, the vessel was not in operation for six months; she was without a crew and officers; she had just changed owners; her Coast Guard certification had been revoked because of the need for boiler repairs, and she was without any other certification necessary for operation. (And remained that way until the work specified was completed.) In addition to the boiler repairs, other propulsion machinery had to be refurbished and in part overhauled, as was the case with her radar, navigational equipment and refrigeration units. As to conditions aboard the vessel, it was in a state of absolute disarray, debris, vermin and filth-ridden, requiring extensive cleaning and refur-

bishing. (See Butler v. Whiteman, 356 U.S. 271, 272, 78 S.Ct. 734, 2 L.Ed.2d 754 (1958) (Dissenting opinion, per Mr. Justice Harlan).

If pressed to choose between the two poles of mothball fleet (*West*, etc.) or annual overhaul (*Lawlor*, etc.), I would say she was closer to the former, by reason of the length of inactivity and her physical and operational state when purchased. Her state was also more closely analogous to the "winter quarter" fleet than a going vessel coming in for miscellaneous repairs preparatory to going out again.

When she was towed to Todd, she was in need of repairs for certification, extensive refurbishing and rejuvenation so as to be put in a navigable state (even prior to having a crew on board), and this is an activity which is not accomplished piecemeal in dribs and drabs. See Latus v. United States, supra, 277 F.2d at 266.

The example given by the Court in *Lawlor*, supra, in attempting to define the term "out of navigation" in the context of the doctrine of unseaworthiness is quite instructive and fully demonstrates the inapplicability of the doctrine to the case at bar. "Surely a vessel that has hit * * * [a] submerged [log] * * * and has damaged her propellers so that she has to be towed to a shipyard * * * cannot fairly be said to have so changed her status as to eliminate any duty to the officers and crew on board to maintain the vessel and her equipment in a seaworthy condition until the repairs have been completed." (275 F.2d at 602–603.)

In the case at bar, however, the vessel without crew and certification and in need of repairs was being reconditioned so that she could be put back in operation and be a seaworthy vessel.

If we impose liability in a case such as this, we would be saying that a shipowner who admits (by force of the facts present in the case) that the vessel is unseaworthy (which is precisely the reason that he was having the work done) nonetheless warrants the vessel's seaworthiness during the repair period. It is absurd to say that he warrants her seaworthiness at the very time that he is spending (all expenses included) over $100,000 due to her unseaworthiness, to put her in a seaworthy condition.

ing 28, taken in the context of a vessel immobile for over six months, which is of importance.

30) The condition and status of the vessel did not appreciably change as of the date of the alleged accident on August 19, 1963.

31) Though Lupo may have been in part performing work traditionally done by a seaman (as much as were the Hercules men) he was working not on a vessel which had come in and was preparing to go out, or on a vessel that had undergone an annual overhaul, but rather a vessel that had not been plying the waters for over six months and was not then a vessel in navigation. If anything, she was a vessel which had to be and was being prepared so that she could go into navigation.

### CONCLUSIONS OF LAW

1. The TADDEI did not warrant her seaworthiness to anyone working aboard the vessel on August 19, 1963, as she was not a vessel in navigation.

2. The libelant is not entitled to the benefits of the Jones Act (46 U.S.C. § 688), one of the requirements of which is a vessel in navigation.

Settle order on notice in conformity herewith.

So ordered.